## LEVIN v. COE, Com'r of Patents.
### No. 8016.

United States Court of Appeals for the
District of Columbia.

Decided Nov. 2, 1942.

Mr. Charles J. Merriam, of Chicago, Ill., pro hac vice by special leave of court with whom Mr. Nelson J. Jewett, of Washington, D. C., was on the brief, for appellant.

Mr. W. W. Cochran, Solicitor, United States Patent Office, of Washington, D. C., for appellee.

Before STEPHENS, VINSON, and EDGERTON, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a judgment of the District Court of the United States for the District of Columbia dismissing the appellant's action brought under Rev.Stat. § 4915 (1875), 35 U.S.C.A. § 63, to authorize the Commissioner of Patents to issue to the appellant a patent containing claims 3, 4, and 6 to 16 inclusive, of the appellant's application for patent serial No. 94,709, filed August 6, 1936. The claims describe a method of making a palatable stable grain germ product of high vitamin B content and the product of that process. Claim 15 to the method and claim 3 to the product are typical. They read as follows:

"15. The method of treating grain germ to extract therefrom substantially all of the oil without affecting its vitamin content, which comprises extracting from grain germ substantially all of the oil with a heated solvent which has hydrolyzed to form an acid, removing the last traces of solvent in the presence of heated moisture and under a vacuum at a temperature substantially below the boiling point of water, the grain being maintained in an acid condition during the entire extraction process."

"3. A finished stable, marketable, nontoxic and palatable dry food product with a high content of vitamin B, consisting of all the constituents of natural grain germ except the oily constituents thereof and with such constituents unimpaired and in the same condition as in the natural germ."

The trial court held the process and resultant product unpatentable over the prior art. The appellant's application is drawn in terms of grain germ, but the testimony and exhibits relate largely to wheat germ and for convenience we shall refer to wheat germ only herein.

The prior art relied upon by the Commissioner in the appeal is the patent to Hoffman of August 23, 1927, No. 1,640,193, the patent to Sure of August 2, 1932, No. 1,869,721, a publication "The Vitamins" by Sherman and Smith, 1922, and the patent to Yaryan of May 17, 1881, No. 241,772. Hoffman discloses a process in which cereal germs are freed from their oil content by the use of a solvent such as benzol or carbon tetrachloride. The residue is then subjected to cooking to gelatanize the starch, and the cooked material is acidified and is malted to effect saccharization. Hoffman describes his process as resulting in a palatable food product. Sure discloses a process of extracting vitamins, including vitamin B, from materials such as rice polishings, wheat germ, cod liver oil and yeast. He states that vitamin B is less stable toward heat (than vitamin G) and in the presence of alkalis, and that in his process he uses acid, including hydrochloric acid, to stabilize it. Sure also describes the use of a partial vacuum (50 mm. to 75 mm. pressure of mercury) and of a temperature of the order of 50° to 60° C., the equivalent of 122° to 140° F. Sherman and Smith describe experiments tending to show that vitamin B in the form of an alcohol solution of wheat embryo is rapidly destroyed by alkalis and has relatively marked stability toward hydrochloric acid. Yaryan's patent covers a "process which consists in adding water or steam to flax seed before crushing or grinding, in combination with any process for extracting oil by percolation with a hydrocarbon solvent, for the purpose of facilitating the process of extracting the oil." His specification refers to "the extraction of oil from flax seed by the use of a liquid solvent and the subsequent removal of

the solvent with superheated steam." The purpose of Yaryan's process, however, is to extract oil from the flax seed and then the solvent from the oil, rather than from the residue of the seed.[1]

The position of the Commissioner is that to obtain the appellant's product it is only necessary to follow Hoffman's use of a hydrocarbon solvent in freeing the wheat germ from oil and then to remove the solvent from the residue constituting Hoffman's intermediate product. This, the Commissioner urges, did not require invention in view of the reference by Yaryan to the use of superheated steam, the mention in Sherman and Smith of the stability of vitamin B toward hydrochloric acid, the maintenance of an acid condition by Sure, and the use by the latter of a partial vacuum and of a temperature order similar to that of the appellant. The Commissioner cites Paramount Publix Corp. v. American Tri-Ergon Corp., 1935, 294 U.S. 464, 473, 55 S.Ct. 449, 79 L.Ed. 997, and quotes therefrom to the effect that "The application of an old process to a new and closely analogous subject matter, plainly indicated by the prior art as an appropriate subject of the process, is not invention." It is to be noted that this language in the opinion in the case cited was immediately preceded by the statement "To claim the merit of invention the patented process must itself possess *novelty*" (italics supplied) and that, as will appear below, the case was decided upon the theory that the "use of an *old* method to produce an *old* result was not invention" (italics supplied).

The trial court made findings of fact which, after describing the appellant's process and product in terms of claims 3 and 15 and describing, with the exception of Yaryan,[2] the references above mentioned,[3] were as follows:

"7. The evidence shows that it is common practice to subject solid materials to the action of steam and vacuum to remove the last traces of a solvent from the material.

"8. It was not invention to remove the solvent from the intermediate product of Hoffman, by method or process set forth in plaintiff's claims, and omit the last stages of the process set forth in the Hoffman patent.

"9. The acid condition favorable to the preservation of vitamin B will obtain in the Hoffman intermediate material when it is subjected to the action of steam to remove the solvent carbon tetrachloride, by reason of the partial hydrolysis of the carbon tetrachloride."

The appellant does not dispute finding No. 9. He does dispute the correctness of findings No. 7 and 8. He does so by virtue of his comparison of the references with his process and product and by virtue of evidence introduced at the hearing below. That evidence was supplied by the appellant himself and by two other witnesses, Oscar Herman Wurster and Clifford Earl Rich. The appellant testified in substance and effect as follows:

After graduating from Michigan State College in 1914 and taking a Master's Degree in science at the University of Michigan in 1917, and after an intermediate period of teaching, the appellant was employed in 1921 and 1922 as Chief of the Bureau of Agricultural Development in the Michigan State Department of Agriculture. In that position he gave consideration to the problem of waste agricultural products, one of which was wheat germ, a by-product of commercial milling. By wheat germ is meant the germinating portion of a grain of wheat (the other parts consist of starchy material and the hull or bran). The wheat

---

[1] The brief of the Commissioner treats the Yaryan process as one which removes the solvent from the residue after the oil has been extracted. But scrutiny of the patent indicates that the steam is used to remove the solvent from the oil rather than from the residue. Not only does the claim describe "the purpose of facilitating the process of extracting the oil" but also the specification refers to obtaining "the best results in yield of oil." Examination of patent No. 205,328 dated June 25, 1878, also issued to Yaryan and referred to in the Yaryan patent No. 241,772 of May 17, 1881, confirms this. Patent No. 205,328 is for the apparatus in which the

process covered by patent No. 241,772 is carried out.

[2] Yaryan was not cited in the Patent Office and was not mentioned by the trial court in its findings.

[3] Finding No. 5 described a publication "Chemistry of Foods" by Sherman, 1920, pages 349-50, as disclosing that wheat embryo contains some toxic substance apparently associated with the oily constituent thereof and that extraction of the oil removes in great measure the toxicity of the embryo. But in the appeal the Commissioner makes no reference to this publication.

germ is rich—probably richer than any other food stuff—in essential nutritious substances. It contains iron, phosphorus, manganese and copper, protein, and has a high vitamin B complex content, including thiamin chloride, riboflavin, nicotinic acid, pyridoxine, and pantothenic acid. Notwithstanding the high nutritive value of wheat germ, it had been conventionally cast aside—to the extent of approximately 400 million pounds per year at a manufacturing value of $80,000,000 [4]—as waste in commercial milling for the reason that wheat germ contains, in addition to the materials above mentioned, oil. This, if left in the germ, rapidly becomes rancid; and if the oil were removed by the use of a solvent—and this had been possible prior to the appellant's process—the presence of solvent in the residue made the latter unpalatable. Prior to the appellant's process it had not been possible to remove the solvent from the wheat germ with sufficient completeness to make the germ palatable. There has been synthetic production of the vitamin B complex, but the synthetic article can not be compared favorably with the natural one. With knowledge of the waste of wheat germ above described, the appellant developed his process. In that process he pours solvent into the raw germ, extracts the oil to less than one-half of one per cent, and then removes the solvent from the residue while heating at a low temperature over a long period of time. The traces of solvent are changed through hydrolysis into ethyl alcohol and hydrochloric acid (the appellant's description of his process was made in terms of the use of ethylene dichloride as a solvent). The minerals in the wheat germ attach themselves to the chlorine to form harmless non-odorous substances like iron chloride. The chlorinated solvent is soluble in water, which is furnished by steam. The result is a change to hydrochloric acid through hydrolysis and the attachment of minerals to the chlorine with consequent removal of the last traces of solvent. [5] The mere use of hot air to remove the solvent is not successful as compared with steam. The appellant's product

contains a higher proportion of vitamin B than the wheat germ contains before processing—this for the reason that the vitamin B is unimpaired in the processing and is concentrated in the residue by the removal of oil and moisture. In a ten-year search of scientific literature the appellant found no single substance of solvent extracted character used for human consumption except coffee—which is decaffeinated by the use of a solvent, but is afterwards roasted. But coffee is not a food.

Since 1936, the appellant has, by means of his process, been manufacturing and selling through the VioBin Corporation—of which he is owner—a wheat germ product known as VioBin. It is produced in two forms, granular and pulverized. The business has been successful. Over 400,000 pounds of the product was sold in 1940, about half of that amount in 1939. It is purchased and shipped to France by the Red Cross as a food substance which will not spoil in crossing the ocean, and is considered by the Red Cross nutritionists as an essential in the substances chosen for prisoners, women and children in unoccupied France. VioBin is purchased by the Peruvian government to be utilized in the interior of Peru where there are problems of malnutrition among the Indians. It has been approved by the American Medical Association in respect of two claims made for it by the VioBin Corporation, one that it is richer in vitamin B than the wheat germ from which it is derived, and the other that it never deteriorates. Not a single package of VioBin has ever been returned, nor has the Corporation, since the commencement of manufacturing, ever received a complaint that the product has had any solvent remaining in it, or indeed a complaint of any kind concerning it.

Hoffman's intermediate product, that is the wheat germ with the solvent remaining in it, would have substantially the same amount of vitamin B as the appellant's product; and if the intermediate material with carbon tetrachloride were subjected to live steam hydrolysis, an acid condition would result with consequent preservation

---

[4] The 400 million pounds per year wastage is based upon an estimate of 176 pounds per capita of flour consumption in the United States, and the recognition by scientists that the germ portion of the wheat is 2%.

[5] The appellant's application described

his product as "solvent free," and explained that by this is meant that the product is palatable and shows no trace of solvent as distinguished by taste or odor. In his testimony the appellant conceded that there were more sensitive chemical tests.

of the vitamin B content. But Hoffman told the appellant personally that he had never tried to remove all of the solvent; and the Squibb Company, which now owns the Hoffman patent, has never used it since it tried it.

The substance and effect of the testimony of the witness Rich was: Rich has been Chief Chemist since August, 1938, of the Ogilvie Flour Mills Company of Canada. The Company is in the general milling business, primarily manufacturing wheat flour, rolled oats and breakfast cereals, and is one of the largest companies in that field in Canada. The chemical records of the Company are in Rich's keeping and control. The Company had known for years that wheat germ is of excellent food value, and it had been trying since about 1931 to put it on the market for human consumption. In the beginning it tried, as had most companies, to package and sell the wheat germ just as it came from the market, without extracting the oil, but like other companies had no success because the germ went rancid very quickly and most of it was returned. The Company attempted to control the length of time that wheat germ could remain on the shelves by dating the packages and arranging for automatic return after a week. This proved unsatisfactory. After having tried a number of experiments over a period of years to stabilize wheat germ, the Company eventually decided to buy VioBin from the VioBin Corporation in packages and sell it in Canada in that form. It has done that now for about three years. About three months prior to the hearing, the Company purchased 50,000 pounds of VioBin, and about a week prior to the hearing it ordered more. It has had no complaints as to spoilage on this material. Just before Rich became Chief Chemist the Company had made and put on the market a breakfast cereal, a cereal flake product containing two and one-half per cent wheat germ. This wheat germ content was not defatted; it was the raw wheat germ just as it came from the flour mill. This cereal was practically a failure because rancidity developed if the packages stayed on the store shelves any length of time. As Chief Chemist of the Company, it was Rich's duty to find out why this breakfast cereal was spoiling. He checked all possibilities and tried runs containing VioBin instead of the raw germ. Since then the Company has had no trouble.

The testimony of the witness Wurster was as follows: Wurster is a chemical engineer of about twenty-five or thirty years experience, a graduate of the University of Michigan with a Bachelor's Degree in 1905 and a Degree of Master of Science in 1906, a post graduate student until February 1907. Since that time he has worked in chemical plants. He is the head of the chemical engineering firm of Wurster & Sanger, Inc., which was organized first as a partnership in 1921. This firm designs and builds chemical process equipment, chiefly for the fat, oil and by-product industries, and particularly for edible oil work. It designs and constructs commercial glycerin, solvent extraction and similar plants. The designing and construction of solvent extraction plants is one of its major businesses; it has built six or eight such plants in the last twenty years.

In respect particularly of the problem of processing for human consumption organic solid material treated with a solvent, the witness testified in terms thus:[6]

[By counsel for appellant on direct examination]

"Q. *Now will you state, Mr. Wurster, whether in your work in the chemical engineering field you know of any instance in which an organic solid material has been treated with solvent and after the treatment with solvent the material has been then processed to the point where the residue is fit for human consumption?* A. *No, I don't know of any such case.*

"Q. If you had been asked in 1933 to design a plant for that purpose, would you have felt that you could have guaranteed success? A. I would say that we would not have undertaken the delivery of such a plant and guaranteed it to produce a residue suitable for human consumption. If such a guarantee had been made, we would have had to insist on first testing it on a pilot plant scale.

"Q. *Was there any problem in removing solvent from fibrous materials, in general, to a point where the material can be used for animal consumption?* A. *Yes, that is done right along.* It has been done for a great many years. There is a great deal of vegetable oil and also some animal

---

[6] The italics throughout the quoted material are supplied.

oils are solvent-extracted, and the *residues are suitable for cattle feed and poultry and so on.*

"Q Can you give us some of those materials, name some? A. Well, taking animal oils first, we extract greases from meat scraps, and the material extracted is then ground up and made into hog and chicken feed; and in the extraction of cottonseed meal, a great deal of which has been for years sent over to Europe, we press cake. Hydraulic press cake from this country has been sent to Europe and solvent-extracted over there, and the meal has been used for feed; and in this country we have also extracted cottonseed and obtained a residue suitable for cattle feed.

"Q. I believe you have told me that in designing and carrying out of solvent extraction process there are several problems involved. Will you just repeat what those problems are? A. Well, there are plenty of very important problems that come up. The ones that we refer to, were in the commercial application of solvent extraction; and that question that you bring up is one that is brought up to us frequently in our commercial work, because chemists work out a solvent extraction process in the laboratory on a laboratory scale, frequently, by what is known as the Soxhlet extraction process, and then think they have something that can be carried out very simply commercially. Well, now, you can do on a small scale in the laboratory, something perhaps which becomes difficult commercially on a large scale. You have got to get out quantities of material, production, so the first important thing is to get that large-scale material in such physical shape that the solvent can permeate it, in the first place; and in the second place, that you can separate the solution from the solid material after you have effected that solution. Now, that is done by flaking the material, or something of that sort, to avoid fine particles. Now, when you have got your solution separted from your solvent material, then you have two other problems:

"The simplest one, the first one, is to separate the solvent from the extracted material, fat or oil, which is quite simple.

*"The next one, then, is to separate the solvent from the solid material, and that is one of the biggest problems in solvent extraction.*

"Q. Will you state whether or not it is a fact, Mr. Wurster, that so far as solid materials are concerned it is a common practice to subject the materials to the action of steam to remove the last traces of solvent therefrom? A. Yes, that is quite frequent. Steam. Steam and vacuum.

"Q. Is that true of food products? A. How? I don't know whether I get your question.

"Q. Is that true of food products, that you remove the last traces of solvent, so far that you are able to use them as food products? A. Well, I don't know. I don't know there are any such food products.

"Q. Well, I asked you if it was a common practice to do that, and I think you slipped there and misspoke yourself. A. I don't think I understood your question. There are no common food products that are obtained by solvent extraction.

"Q. Is it true as to food products that it is necessary to remove the last traces of solvent in order to make them palatable? A. Yes, it is, because all of the solvents that I know are objectionable to taste.

"Q. In removing one liquid from another liquid are there common physical laws which govern the separation? A. Yes. The laws of distillation and fractionation.

"Q. In general, if you were asked to separate one liquid from another liquid, is there any considerable problem involved? A. No. That is done. The problem becomes greater as the boiling points of the components approach each other, but it is done regularly, even with liquids whose boiling points closely approach each other.

"Q. Is that true of the removal of a liquid from a solid? A. No. In the case of liquids and solids you have got too many other uncontrollable factors entering into it.

"Q. Can you name some of these factors? A. Well, you've got questions of surface tension. You've got the solid material. The solvent permeates the solid material, and it won't let loose. The solid material absorbs the liquid material, and it absorbs it, and you have surface tension there. You have many possible physical differences in the solid.

"Q. Can you tell the Court what the fact is as to the difficulty of removing last traces of water in solids? Can you give some examples of that? A. To absolutely remove the final traces of water is very difficult. You've got to heat the material on which you've got a film of moisture very hot, considerably above the atmos-

pheric boiling point of water. You can help to effect that by putting it under vacuum, by using dry agents; but as a matter of fact it illustrates the difficulty. Even on a vitreous surface or a metal surface it is difficult to remove final traces of water. So that it emphasizes the difficulty that there is of taking a liquid out of the pores of a solid material.

"Mr. Merriam. That is all.

[By counsel for the Commissioner on cross-examination]

"Q. I believe you testified that it is the common practice to apply live steam to a solid residue to remove the remaining portions of solvent which has been applied to it. A. Yes, steamed off under vacuum. That is the common practice.

"Q. Is there any reason—would you have any reason to suppose that the same procedure would not be completely successful if applied to a solid residue of matter which could be used as food? A. I don't think I understand your question, sir.

"Q. Would you have any reason to suppose that the application of steam to a residue of food matter would not be successful in removing the solvent from it that had remained after extraction? A. Whether the residue would be suitable for human consumption?

"Q. Whether a residue intended for human consumption could be successfully treated with live steam to remove solvent. A. It is very difficult to remove it. You even have to use considerable care to make it suitable for animal food, for cattle, so it would be even more difficult to make it suitable for human food.

"Q. It is successful, though, is it not? A. I don't know of its having been successful anywhere outside of Mr. Levin's product.

"Q. Well, that is what he did; he applied live steam to it; is that it? A. Under special conditions.

"Q. Under temperature and pressure, I believe. A. And a certain solvent. It might not apply to all solvents.

[By counsel for appellant on re-direct examination]

"Q. Mr. Wurster, just to clear this up: In so far as the physical laws of separation go, it does not make any difference whether the product is to be used as a food or anything else, does it, as to how much solvent you can get off? A. No.

"Q. The fact is that from any kind of solid residue you don't get the last traces of material off that would be required to be off if you were going to use it for a food; is that correct? A. Yes.

[By counsel for the Commissioner on re-cross-examination]

"Q. Well, how did they get it off in this case, then, Mr. Wurster? You say they are unsuccessful in getting it out entirely? A. That is correct, by steam. The solvent that Mr. Levin uses is ethylene dichloride, and the final traces remove themselves by hydrolysis by steaming.

"Q. Oh, the steam produces some hydrolysis, and that—A. (Interposing) Yes, and his ethylene dichloride breaks down into hydrochloric acid, which reacts with the mineral products in his wheat germ and increases his chlorides, as shown by analysis.

[By counsel for appellant on further re-direct examination]

"Q. Just one question: Do you know of any other process of any kind in which hydrolysis is made use of in the same way? A. No, I do not."

We have been at pains to state the substance and effect of the testimony of the appellant and of the witness Rich and to set out the testimony of the witness Wurster in part in substance and effect and in part in terms for the reason that, in our view, when all of this evidence is considered in connection with the nature of the appellant's process and product and in view of the prior art and in the light of settled principles of patent law to be referred to below, a disposition of the case different from that made by the Board of Appeals and by the trial court must result. It is to be noted that the Board of Appeals did not have the benefit of the evidence, although the trial court did.

The generalization relied upon by the Commissioner—that the application of an old process to a new and closely analogous subject matter, plainly indicated by the prior art as an appropriate subject of the process, is not invention—although regarded as apt in Paramount Publix Corp. v. American Tri-Ergon Corp., cited by the Commissioner, is not apt in the instant case. The Paramount case was an infringement proceeding in which a process patent to one Vogt and others was under attack as invalid. The claims there involved described a method of producing a

single photographic film by printing upon it a picture record and a sound record from separately exposed and developed negatives. The positive film thus produced was useful and extensively used in reproducing sound and picture records in the exhibition of talking moving pictures. The opinion of the Supreme Court, by Mr. Justice Stone, pointed out that while the claims of the Vogt process spoke of a method for producing a combined sound and picture positive film, it was obvious that the process described had no necessary connection with sound reproduction; that the positive film bearing the combined sound and picture records was a product of the photographic art and that the method claimed for producing it related exclusively to that art. The only step in the method, said the opinion, for which any advance could be claimed was the process of uniting two records on a single positive film by printing them from separate negatives. Upon reviewing the prior art the opinion concluded that:

"The simultaneous photographing of sound and picture records was not novel, separate development of the negatives was well known, the advantage of uniting the two records, sound and picture, on a single film was well known, and the method of uniting two photographic picture records by printing them from the separate negatives was well known.

"This use of an old method to produce an old result was not invention. See Electric Cable Co. v. Edison Co., 292 U.S. 69, 80, 54 S.Ct. 586, 78 L.Ed. 1131, and cases cited. . . ." [294 U.S. at pages 472, 473, 55 S.Ct. at pages 452, 453, 79 L.Ed. 997]

Then the Court made, in the context above explained, the statement upon which the Commissioner relies in the instant case. It is noteworthy that the opinion in the Paramount case continued by excluding any possibility of application to the facts of the case of the principle to which we refer more particularly below—that where a method or device satisfies an old and recognized want invention may be inferred rather than the exercise of mechanical skill. The opinion pointed out that the state of the motion picture art as disclosed by the record indicated that there was no generally recognized demand for any type of film record for the reproduction of sound to accompany motion pictures until after the Vogt patent was applied for.

 In Carbide and Carbon Chemicals Corporation v. Coe, 1938, 69 App.D.C. 372, 102 F.2d 236, and again in Thornton v. Coe, 1938, 69 App.D.C. 383, 102 F.2d 247, we recognized the principle that satisfaction by a method or device of an old and recognized want is highly persuasive of invention. The basis of that doctrine is that otherwise the mere skill of the art would normally have been called into action by the known want. The doctrine is authenticated by leading cases too numerous to mention. We cited them in the two cases just referred to.[7] It is also settled in the law of patents that the fact that all of the elements entering into a combination are old does not necessarily negative the existence of invention. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Iron Fireman Mfg. Co. v. Industrial Engineering Corp., 7 Cir., 1937, 89 F.2d 904. Such a combination may be patentable invention if it produces a new result, or an old result in a new or more efficient way. Independent Oil Well Cementing Co. v. Halliburton, 10 Cir., 1932, 54 F.2d 900, certiorari denied, 1932, 286 U.S. 544, 52 S.Ct. 496, 76 L.Ed. 1281; N. O. Nelson Mfg. Co. v. F. E. Myers & Bro. Co., 1928, 25 F.2d 659, certiorari denied, 1932, 287 U.S. 617, 53 S.Ct. 18, 77 L.Ed. 536; see Walker on Patents (Deller's ed. 1937) 147–149. The fact that the combination later appears to be a simple one does not necessarily negative the presence of a high degree of inventive genius. Loom Company v. Higgins, 1881, 105 U.S. 580, 26 L.Ed. 1177;[8] Di-

---

[7] In Toulmin, Invention and the Law (1936) § 39, the author states: "Where, especially in a crowded art, many workers have overlooked the solution achieved by the inventor in question, there is proof of invention, since it shows that the result, means, or method adopted was not obvious but was the fruit of intellectual effort of the true inventor. The contract between the long search for results, with the endless accumulation of failures, and the final step that has turned these failures into success, is a demonstration that there must be invention in the manner, method, and mechanism proposed by the inventor. In invention, as in other things, nothing succeeds so much as success."

[8] In Loom Co. v. Higgins, Mr. Justice Bradley said, in respect of an improvement in looms for weaving pile fabrics: "But it is plain from the evidence, and from the very fact that it was not sooner

amond Rubber Co. v. Consolidated Rubber Tire Co., supra. We recognized these principles in Electrons, Inc., v. Coe, 1938, 69 App.D.C. 181, 99 F.2d 414.

■ We think it clear that under the facts of the instant case the language of the Paramount case—that the application of an old process to a new and closely analogous subject matter, plainly indicated by the prior art as an appropriate subject of the process, is not invention—is not pertinent and that on the contrary the competing principles we have stated above are pertinent and that when applied to the facts of the instant case they require the conclusion that the appellant's process and product are patentable. The appellant's process and resultant product are not old. Hoffman's process, although it removes oil from wheat germ by the use of a hydrocarbon solvent, does not remove the solvent from the residue by the use of steam or at all. Sure's process uses acid, including hydrochloric acid, to stabilize vitamin B and uses a partial vacuum and a temperature order similar to that of the appellant, but in no other respect does the Sure process resemble the appellant's. While Yaryan refers to the use of steam it is for the removal of solvent from the oil of flax seed, not from the residue of the seed. So also the products of the prior art are not the product of the appellant. Hoffman's end product is a soluble sugar. He does not purport to achieve a wheat germ in its natural form less only its oil and all traces of the solvent used to remove the oil. Sure's process produces an extract containing vitamins, not the wheat germ as such with its other nutritional substances. Yaryan ends with a solvent free oil. The flax seed residue which he undoubtedly also produces bears no resemblance, as referred to in his patent, to the wheat germ of the appellant. Moreover, the products of the prior art cannot be regarded as fit for human consumption. While Hoffman mentions palatability in his soluble sugar, he does not say that it

is palatable for human use; and the testimony of the appellant shows that Hoffman had never tried to remove all of the solvent and that neither his process nor product has even been used at all. Sure does not purport to make food for human consumption; neither does Yaryan. Under the uncontradicted evidence the appellant's process for the first time combined the elements of the prior art and achieved a new result, a wheat germ product palatable for human consumption and stable. Moreover, what the appellant accomplished in his process and product was not, within the generalization of the Paramount case, plainly indicated by the prior art. On the contrary, again under the uncontradicted evidence, what the appellant accomplished was the satisfaction of an old and recognized want. And under the uncontradicted evidence the appellant's process and product are useful and commercially successful in high degree. From the wastage of the old art of commercial milling the appellant has salvaged for human use the highly nutritious wheat germ, long sought to be salvaged for human consumption.

■■ Finding of fact No. 7 to the effect that the evidence shows that it is common practice to subject solid material to the action of steam and vacuum to remove the last traces of a solvent from the material, is in our view clearly wrong for the reason that it omits to state a material qualification. It is true that the witness Wurster testified to the effect stated in the finding. But that one statement by Wurster cannot be read out of context, and it is clear from the whole of his testimony that he did not mean that it is a common practice to subject solid material to the action of steam and vacuum to remove the last traces of solvent from an organic solid material to the point where the residue is fit for human consumption. On the contrary he said specifically that he did not know of any way in which an organic solid material had been treated with a solvent and after the treatment the material then

---

adopted and used, that it did not, for years, occur in this light to even the most skilful persons. It may have been under their very eyes, they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. . . . Now that it has succeeded, it may seem very plain to any one that he could have

done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention. . . ." [105 U.S. at page 591, 26 L.Ed. 1177]

processed to a point where the residue was fit for human use. He said that solvent had been removed from fibrous material for animal consumption such as cattle feed, poultry feed and the like, but that there are no common food products obtained by solvent extraction. He specifically testified on cross-examination by counsel for the Commissioner that it was very difficult to remove solvent by live steam from a residue intended for human consumption; that it is necessary to use considerable care even to make it suitable for animal food, and that he did not know of its having been successful in respect of food for human use outside of the appellant's product.

█ When viewed in the light of the prior art and all of the evidence and in the light of the pertinent principles of law which we have stated above, finding No. 8, to the effect that it was not invention to remove the solvent from the intermediate product of Hoffman by the method set forth in the appellant's claims and to omit the last stages of Hoffman's process, is also clearly not supportable. The finding fails to reflect the facts shown by the references and evidence that the appellant's process is a combination of old elements producing a new result and that it satisfies by the production of a palatable, stable wheat germ of high nutritive value for human consumption a want which had long been recognized but unsatisfied in the milling art. The court omitted to make any finding of such facts. Since the facts which the finding fails to reflect were relevant under the pertinent principles of law stated above, the court should have found them even though the question whether the appellant's process is a combination of old elements producing a new result and satisfying a long recognized but unsatisfied want was not in terms made an issue under the pleadings. See Rule 15(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. As in our view the court could properly under the uncontradicted evidence have made no finding except one which reflected the facts which we have stated, it would be idle to return the case for further findings.

We conclude that the trial court should have authorized the issuance of a patent for claims 3, 4, 8, 9, 10, 11, 12, 14, 15 and 16.

There remains for discussion the findings of fact and conclusions of law dealing with claims 7 and 13; and there remains for discussion also claim 6.

█ In finding of fact No. 11, claims 7 and 13 for the product are found to contain a recitation of the process step "freed from oil by solvent extraction." The trial court concluded in conclusion of law No. 2 that these claims do not properly define the appellant's product and are not patentable. The Commissioner contends that the dismissal of the appellant's complaint as to these claims was correct under In re Jones, 1929, 58 App.D.C. 379, 30 F.2d 1003. That case holds that a product claim cannot properly contain limitations as to the structure and mode of operation of the machine by which the article sought to be patented is made. There is no proper basis for distinguishing that case merely because the article manufactured in the instant case is the result of a chemical process rather than the result of the operation of a machine. There are different rulings elsewhere—see Trussell Manufacturing Co. v. Wilson Jones Co., 2 Cir., 1931, 50 F.2d 1027; cf. Ideal Roller & Manufacturing Co. v. Sutherland Paper Co., 6 Cir., 1938, 96 F.2d 675—but we feel obliged to follow In re Jones and accordingly we hold that the dismissal as to claims 7 and 13 was correct.

█ The trial court found that claim 6 for the product recited nothing amounting to invention over the prior art and on that account concluded that the claim was not patentable. For the reasons set out in this opinion, we disagree with the court's finding and conclusion in the respect mentioned. But we note that claim 6 possesses the same recitation of the process step "freed from oil by solvent extraction" as claims 7 and 13. We, therefore, conclude that the trial court correctly dismissed the complaint, although upon a wrong ground, as to that claim.

In accordance with the foregoing we affirm the decision of the trial court in respect of claims 6, 7 and 13 and reverse as to claims 3, 4, 8, 9, 10, 11, 12, 14, 15 and 16.

Affirmed in part, reversed in part.