**KAMBORIAN et al. v. UNITED SHOE MACHINERY CORPORATION.**

Civil Action No. 2751.

District Court, D. Massachusetts.

Oct. 29, 1945.

Robert Cushman and Roberts, Cushman & Grover, all of Boston, Mass., for plaintiffs.

Fish, Richardson & Neave and Charles E. Hammett, Jr., all of Boston, Mass., (Alex D. Salinger, of Boston, Mass., and Stephen H. Philbin, of New York City, of counsel), for defendant.

SWEENEY, District Judge.

In this action the plaintiffs, who are, respectively, the owner and the sole licensee of the patents here involved, charge the defendant with infringing Letters Patent No. 2,251,284, a machine patent, and No. 2,254,224, a method patent. The plaintiffs seek an injunction against further infringement and an accounting of profits. The defenses urged at the trial were that the patents were invalid for want of invention, or because misdescriptive or inoperative, and a denial of infringement.

All of the parties are active in the construction and leasing of shoe building machinery. The present action concerns shoe lasting machinery. The claims in issue are claims 13 and 19 of the method patent, and claims 26 and 28 of the machine patent. Claim 13 of the method patent, which is typical of all of the claims, reads as follows:

"That method of lasting shoes which comprises as steps seizing a narrow area of the margin of the upper and applying positive lasting pull thereto in a direction substantially perpendicular to the last bottom, progressively and uninterruptedly shifting the point of application of such pull along the periphery of the shoe bottom, and wiping narrow areas of said margin inwardly over the insole successively from point to point longitudinally of the shoe."

Shoe lasting is the art of affixing the upper portion of a shoe to the insole in such a fashion as to cause it to be shaped as nearly as possible to a human foot. Prior to the use of lasting machines, the operation was performed by hand; that is, an operator would tack an insole to the bottom of the wooden last, then slip the last into the leather or cloth upper, and align the parts so that a proper union might be made. After alignment, the operator would seize the margin of the upper with a pair of pincers, tensioning the material to conform to the contour of the last, and then affix the margin of the upper to the bottom of the insole, usually by tacking it. The operator would then proceed from point to point along the insole until the upper was firmly and completely affixed thereto.

The first improvement over hand lasting was the so-called "Niggerhead" machine, which was introduced about 1890. This method was an improvement over hand lasting, but the union between the sole and the upper was still made at intermittent stages and required many stages of operation before completion.

In the industry there was a long felt need for a machine which would do continuous lasting so that, in one simple operation, the upper could be affixed to the insole. In 1920 the McFeeley Patents Nos. 1,356,539 and 1,356,540, and in 1925 the Varney Patent No. 1,541,875, were issued to the defendant. These patents were designed to provide continuous lasting, but the machines made under them proved to be unsuccessful. Incidentally, it might be mentioned at this point that the defendant company maintains a research department of approximately 200 employees, 20 of whom devote their time to patent work. The patentee's idea, which was the basis for his patent application, came from his observation of a tack pulling machine, which was used to pull tacks from wooden lasts. This tack puller consisted of two rollers suspended beneath an arm parallel to each other. Each roll had a helical, knurled rib with the spiral opposite a similar spiral on the other roll. At the base of each roll the spirals ended in a rather fine and sharp point. When the points were inserted under the tack head, the tack rode up the spiral rolls and out of the wood. The patentee conceived the idea of utilizing similar rolls to lift and tension the upper of a shoe so that it could be turned over and affixed to the insole. In patent application No. 2,251,284, the patentee refers to his rolls as "gripper rolls" having "helical ribs of opposite pitch respectively, the ribs of the two gripper rolls normally meshing. Preferably the outer edges of these helical ribs are knurled so as to grip the material firmly between the rolls." (P. 2, col. 1, 1. 52.) The Kamborian rolls exert a positive grip, and by that it is understood to mean a grip which grasps the material firmly against opposing pressure.

Kamborian, the patentee, is a man of considerable mechanical ability but his knowledge of mechanical principles and theories has not been demonstrated. At the time that he filed his patent application he was of the opinion—and probably is to-

day—that the introduction of material between such rolls as he describes in his invention would have a tendency to uplift or pull it in the same way that the tack puller rode the head of the tack up its helical ribs. In the case of the tack puller, the head of the tack extended over the edge of the helical rib and, when the rolls were turned, it was compelled to ride upwardly. I do not believe that it necessarily follows that cloth or leather, contacting only the outer surface of the helical rib, would rise in the same way. Undoubtedly, while there is direct engagement of the cloth between the ribs there may be some such upward pull, but the pull, if any, on the material is not sufficient to completely tension the material to conform to the contour of the wooden last. Such additional tension as may be needed is provided by the operator who exerts pressure by pushing the last inwardly towards the body of the machine, or by presenting the work at an angle to the rotating gripping rolls. The resulting tension is sufficient to do a workmanlike job in conformance with the patent claims. Whether or not Kamborian understood all that his machine would do at the time that he described it in his patent application is immaterial. He is entitled to the benefits of all that he has created. With few minor improvements, the machines that Kamborian has built read directly on the patents.

■ If a patentee clearly describes the new structure, it is unnecessary that he also describe the new mode of operation. I. T. S. Rubber Co. v. Panther Rubber Co., 1 Cir., 260 F. 934, 937; Warren Steam Pump Co. v. Blake & Knowles Steam Pump Works, 1 Cir., 163 F. 263, 277. The patentee is not required to state the principle of operation of his invention, or even understand it, as long as the mechanism is so described that it can be reproduced. Eames v. Andrews, 122 U.S. 40, 55, 7 S. Ct. 1073, 30 L.Ed. 1064; Marconi Wireless Tel. Co. v. DeForest Radio, 2 Cir., 243 F. 560, 563.

Both the original model, Exhibit 14, and the commercial machine, perform the shoe lasting operation. The invention is described in terms sufficiently clear and exact as to enable any person skilled in the art to duplicate it. It is immaterial that the principle of operation is not as described in the patent, since it is the process, and not the theory, which is patented.

Having provided a method for gripping and tensioning the upper, Kamborian next provided for turning the previously gripped portion of the upper onto the insole by supplying a member which he termed a "wiper." This is a rapidly reciprocating arm which wipes in the material over the insole and lays it down into adhesive engagement with the insole. Kamborian also provides for such union through the use of staples instead of adhesion.

■ The Kamborian machine provided a continuous, instead of a step-by-step, lasting operation. This was the first successful machine of this type on the market. An average workman on the Kamborian machine can do 1,500 pairs of shoes per day, as against a former output of 500 to 600 pairs under the old commercial practice. Today there are 213 Kamborian machines in operation in 114 different plants in the United States, Canada, England, and India. By a combination of two old and well known devices, Kamborian has achieved that success for which the industry had been searching for a long time. It cannot be argued that this is a mere aggregation of old devices producing no new result. It is evidence of invention when a new combination of known elements produces a new and beneficial result, never attained before. Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177. The Kamborian machine produced the first successful technique for continuous lasting, a result which had been desired before, as evidenced by Varney and McFeeley.

■ The history or condition of the trade or art to which the patent is applied may be considered in determining the existence of invention. Levin v. Coe, 76 U.S. App.D.C. 347, 132 F.2d 589; Hookless Fastener Co. v. G. E. Prentice Mfg. Co., 2 Cir., 68 F.2d 940. Important in this regard is the fact that the patentee has succeeded where others have failed. Loom Co. v. Higgins, supra; Wirebounds Patents Co. v. H. R. Gibbons Box Co., 7 Cir., 25 F.2d 363, 364. The knowledge necessary to fill the long felt need for a continuous lasting machine was not such knowledge as might be possessed by a skilled mechanic. Hotchkiss v. Greenwood, 1 How. 248, 267, 13 L.Ed. 683; Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58. It was actual and valuable patentable invention, and I find that this patent was not

anticipated by any of the patents cited by the defendant.

In McFeeley Patents Nos. 1,356,539 and 1,356,540, and Varney Patent No. 1,541,-875, both the tensioning and the wiping action is provided by friction. The Leveque Patent No. 1,864,510 in no way resembles the machine described by the patents in suit, as Leveque provided for stitching the upper of a shoe after it had been turned outwardly so as to secure it to the upper surface of the sole of the shoe itself. Lawson Patent No. 2,140,532 and Fowler Patent No. 1,474,353, do not even refer to lasting machines. They provide for trimming away the surplus material after the shoe has been lasted. Avery Patent No. 472,599 operates on an intermittent, or step-by-step, rather than a continuous principle.

In the year 1942 the plaintiffs had about 48 machines out on lease and in use; in 1943 the defendant's machine first appeared. This is its "Model A" and is the alleged infringing machine. This machine is strikingly similar to the patented machine in its operation, but it seems to be the studied result of an effort to avoid duplication or infringement. It is sufficiently similar so that it cannot escape a charge of infringement. Instead of utilizing the helical ribs oppositely rotating, each on a separate cylinder in a perpendicular position, the defendant utilizes one knurled roller which presses the material against a polished, rigid plate or sleeve. This roller is disposed at an angle of 16° to the perpendicular. The effect of this angular disposal is to provide uplift or tension on the material. As a wiping means to effect the adhesive engagement of the margin of the upper with the insole, the defendant's machine utilizes an endless chain whose lower run sweeps inwardly across the shoe bottom, folding and pressing the material into adhesive contact with the insole. The defendant seeks to avoid the charge of infringement by alleging that its roller does not provide a positive grip, but rather a frictional or slipping grip, so that the material will not continuously rise at the disposed angle. I am satisfied that the grip of the defendant's machine is positive in the sense that it is substantially impossible to disengage the material from the grip of the roll and sleeve. The slipping which the defendant refers to occurs also in the plaintiffs' machine. Whether it is defined as "slipping" or "let go" or "release from the stretching or pulling tension", it all amounts to the same thing.

The test of infringement is whether the machines of the patentee and the defendant perform substantially the same operation, by substantially the same means, to produce the same result. Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935; United States Envelope Co. v. Sherman Envelope Co., 1 Cir., 122 F. 464, 466.

Both machines provide for the automatic feed of the work. Both machines provide gripping means which, during the progress of the work, constantly seizes fresh portions of the material of the shoe upper, while, at the same time, releasing the portion just previously seized and stressed, the latter immediately being engaged by wiping means. Both machines have work engaging elements: Plaintiffs', two oppositely rotating rolls; defendant's, one rotating roll acting against a polished plate. These work engaging elements exercise on both machines a positive grip, with varying amounts of slippage. In both machines the gripping means operate not only to feed the work forwardly, but also to tension the material of the upper. This is sufficient for substantial identity. Both machines provide for a wiper to engage the margin of the upper material immediately after it leaves the gripping means, and lay it down into adhesive contact with the insole.

### Conclusions of Law.

(1) The claims in suit of Kamborian Patent Nos. 2,251,284 and 2,254,224 are valid, having met the requirements of patentable invention.

(2) Claims 26 and 28 of Kamborian Patent No. 2,251,284 and claims 13 and 19 of Kamborian Patent No. 2,254,224 are not invalid for anticipation by prior patents.

(3) The claims in suit are not invalid because misdescriptive or inoperative.

(4) Defendant's Model A machine infringes claims 26 and 28 of Kamborian Patent No, 2,251,284 and claims 13 and 19 of Patent No. 2,254,224.

The plaintiffs are entitled to a decree sustaining the patent and the claimed infringement thereof.