**DOLLAR et al. v. LAND, Chairman, United States Maritime Commission, et al.**

No. 10299.

United States Court of Appeals
District of Columbia Circuit.

Argued April 19, 1950.

Decided July 17, 1950.

Writ of Certiorari Denied Nov. 13, 1950.
See 71 S.Ct. 198.

Messrs. Gregory A. Harrison and Moses Lasky, San Francisco, Cal., with whom Messrs. Clinton M. Hester and Michael M. Kearney, Washington, D. C., were on the brief, for appellants.

Mr. Donald B. MacGuineas, Attorney, Department of Justice, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Assistant Attorney General H. G. Morison and Mr. Edward H. Hickey, Special Assistant to the Attorney General, were on the brief, for appellees.

Before CLARK, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

This case was before us on a prior appeal which concerned a question of jurisdiction.[1] The Supreme Court affirmed our judgment sustaining jurisdiction.[2] Upon remand to the District Court a lengthy trial was had before the court without a jury, and judgment was rendered for the defendant officials. Plaintiffs now appeal.

1. Dollar v. Land, 1946, 81 U.S.App.D.C. 28, 154 F.2d 307.

2. Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 1010, 91 L.Ed. 1209.

Introductory to its opinion the Supreme Court described the case as follows:

"Petitioners are present and former members of the United States Maritime Commission. Respondents are stockholders of Dollar Steamship Lines, Inc., Ltd. (Dollar of Delaware), whose corporate name was changed to American President Lines, Ltd., subsequent to the execution in 1938 of a contract out of which the present litigation arises. By 1937 Dollar of Delaware was in difficult financial straits. The problems confronting it and the various steps taken to remedy the situation need not be recapitulated here. It is sufficient for purposes of the various questions presented by this case to say that the Commission and respondents entered into a contract in 1938 by which respondents delivered their common stock in Dollar of Delaware, endorsed in blank, to the Commission; and the Commission released some of respondents from certain obligations and agreed to grant Dollar of Delaware an operating subsidy and to make a loan to it and to obtain for it another loan from the Reconstruction Finance Corporation.

"The subsidy was granted and the loans were made. By 1943 American President Lines, Ltd., had fully paid all indebtedness due the United States. Respondents thereupon demanded return of their shares of stock from the then members of the Commission, claiming that the shares had only been pledged as collateral for a debt which had been paid. The members of the Commission refused to surrender the shares, claiming that they had not been pledged under the 1938 contract but transferred outright. Acting on that theory the Commission had indeed offered the shares for sale and had under consideration substantial offers to purchase them.

"Thereupon respondents instituted the present suit in the District Court for the District of Columbia, see 11 D.C. Code, §§ 301, 305, 306, claiming that petitioners were unlawfully in possession of respondents' stock and illegally withholding it. The prayer was that petitioners be restrained from selling the shares and be directed to return them to respondents."

Summarizing the issues on the merits the Court said:

"The allegations of the complaint, if proved, would establish that petitioners are unlawfully withholding respondents' property under the claim that it belongs to the United States. That conclusion would follow if either of respondents' contentions were established: (1) that the Commission had no authority to purchase the shares or acquire them outright; or (2) that, even though such authority existed, the 1938 contract resulted not in an outright transfer but in a pledge of the shares."

 Upon the subsequent trial the District Court held that the Commission had power to take absolute title to the stock and that the contract was one of sale rather than of pledge.[3]

The rule by which we are guided in our examination of the findings of the trial court in this case was laid down by the Supreme Court in United States v. United States Gypsum Co.,[4] where the Court said: "Since judicial review of findings of trial courts does not have the statutory or constitutional limitations on judicial review of findings by administrative agencies or by a jury, this Court may reverse findings of fact by a trial court where 'clearly erroneous.' The practice in equity prior to the present Rules of Civil Procedure was that the findings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, had great weight with the appellate court. The findings were never conclusive, however. A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

The Second Circuit Court of Appeals, discussing the Gypsum case, derived the following: "Where a trial judge sits without a jury, the rule varies with the char-

---

3. Dollar v. Land, D.C.1948, 82 F.Supp. 919.

4. 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

acter of the evidence: (a) If he decides a fact issue on written evidence alone, we are as able as he to determine credibility, and so we may disregard his finding. (b) Where the evidence is partly oral and the balance is written or. deals with undisputed facts, then we may ignore the trial judge's finding and substitute our own, (1) if the written evidence or some undisputed fact renders the credibility of the oral testimony extremely doubtful, or (2) if the trial judge's finding must rest exclusively on the written evidence or the undisputed facts, so that his evaluation of credibility has no significance." [5]

In the case at bar the findings of the trial judge rested entirely upon documentary evidence or undisputed basic facts. We review the case upon that basis.

The first problem presented to us upon this appeal is whether the Commission had authority to acquire the shares of stock outright by purchase. If it had such authority it had authority to acquire by purchase the stock of any operating ship company and to operate that company. The Commission was created by statute and has only such authority as the statute, directly or by necessary implication, confers upon it. It does not contend that the statute specifically or in terms confers the power to acquire and operate a steamship company, and careful reading does not reveal any such provision. The only section to which the Commission points as giving it the authority it claims is:

"The Commission may enter into such contracts, upon behalf of the United States, and may make such disbursements as may, in its discretion, be necessary to carry on the activities authorized by this chapter, or to protect, preserve, or improve the collateral held by the Commission to secure indebtedness, in the same manner that a private corporation may contract within the scope of the authority conferred by its charter. * * *" [5a]

The Commission argues that it has all the general and implied powers of a private corporation; that one of the implied powers of such a corporation is the power to settle or compromise claims; and that the acquisition of outright title to this stock amounted to a settlement or compromise of the liability of R. Stanley Dollar and Dollar of California as sureties on the ship notes. In its brief the Commission says, "The Commission's substantive powers are those granted it by statute, and its implied powers are those reasonably necessary and appropriate for it to administer its substantive powers, just as a private corporation's implied powers are those reasonably necessary and appropriate for it to carry out the substantive powers and objects provided by its charter."

The power to own and operate transoceanic steamship lines is a power of tremendous scope. It would involve decisions of vast national importance and the collection and disbursement of vast amounts of public funds. It is inconceivable to us that Congress would have left to implication so vast a power. We do not think that if Congress had intended the Maritime Commission to enter upon such ownership and operations it would have left the matter entirely to a clause which merely authorized the Commission to execute contracts.

But the Commission does not say that it has a general power to acquire stock by purchase, apart from its other duties in respect to maritime operations. It says that its power to acquire stock is incident to its power to compromise or settle claims. It can, it says, accept stock in the settlement or compromise of a claim.

The proposition thus presented by the Commission has strong basis. Since the Commission has statutory power to make loans and to manage them, an implied power to accept satisfaction of, or upon proper grounds to settle, the claims thus created seems reasonable and in accord with the usual rules of law. At the same time there is a strong contrary view, based upon decided cases, official opinions, and statutes as to the power to compromise claims for

5. Orvis v. Higgins, 2 Cir., 1950, 180 F.2d 537, 539.

5a. Sec. 207 of the Merchant Marine Act of 1936, 49 Stat. 1988, as amended by the Act of June 23, 1938, 52 Stat. 954, 46 U.S.C.A. § 1117.

and against the United States.[6] But we do not decide that question, because we do not reach it. We must first decide whether the acquisition of this stock was part of the compromise or settlement of a claim.

Dollar of California and R. Stanley Dollar were sureties on debts of Dollar of Delaware to the Commission. Under the agreement here in question the sureties were released from their obligation and stock was "transferred" by them to the creditor. No part of the debt was released. The question is whether that transaction was the settlement of a claim or was a substitution of tangible collateral for personal surety. This leads us directly into the second question as posed by the Supreme Court, which is whether the transaction was a sale or a pledge.

There is no single decisive index to the nature of the 1938 contract. The answer to the problem depends upon the comparative evaluation of various indices, some pointing one way and some the other.

First, however, we review briefly the background of the controversy. In 1923 seven ships were purchased by Dollar of California from the Shipping Board, predecessor of the Maritime Commission. Promissory notes, secured by ship mortgages, were given for the purchase price. In 1925 five other ships were purchased, promissory notes being given and ship mortgages issued to secure the debt as in the 1923 purchase. In 1929 Dollar of California borrowed from the United States, represented by the Shipping Board, $750,000 on promissory notes. In that same year Dollar of California, with the consent of the Shipping Board, sold to Dollar of Delaware all of its interest in the ships. That agreement provided that Dollar of California would remain jointly and severally liable with Dollar of Delaware on the 1923 purchase notes and mortgages; R. Stanley Dollar and Dollar of California were jointly and severally liable with Dollar of Delaware on the 1925 purchase notes and mortgages. In 1931 Dollar of Delaware obtained from the Shipping Board construc-

tion loans in the amount of $11,191,400 for two ships. The loan for one of the ships was thereafter paid off. In August, 1938, Dollar of Delaware owed the Commission $7,493,274.56. On this debt Dollar of California was surety (according to the Commission's view) for $3,575,193, and R. Stanley Dollar was surety for $1,781,250.

At this time the Adjustment Agreement, which is the nub of the present controversy, was made. The financial position of Dollar of Delaware was precarious. The agreement was called an "Adjustment Plan". The common stock of Dollar of Delaware was of two classes, A and B. Dollar of California held (or agreed to acquire and hold) all the Class B stock. It agreed to "transfer, or cause to be transferred, all of said stock to the Commission, or its nominee, free and clear of all liens and incumbrances". The Class A stock was held by several persons, and part of it was under pledge by those persons to the Anglo Bank. That stock was also transferred to the Commission, the pledged stock remaining subject to the prior pledge. Provisions of the agreement dealt with management, office space, furniture, employees, use of the name "Dollar", and other miscellaneous matters. The Commission and Dollar of Delaware agreed to release R. Stanley Dollar and Dollar of California "from all liability as makers, comakers, guarantors, or endorsers of the ship mortgage notes", that paragraph also providing "that said releases shall not release or in any way impair its obligations under said notes or said mortgages securing the same, nor shall any credits be allowed or given thereon, either as to principal or interest by reason of the stock transfers or other consideration that may be received by the Commission under the terms and provisions hereof."

Dollar of Delaware agreed to take all steps necessary to (a) obtain an operating subsidy from the Commission, (b) obtain a loan of $1,500,000 from the Commission, and (c) obtain a loan of not less than $2,000,000 from the Reconstruction Finance

6. See, for example, Royal Indemnity Co. v. United States, 1941, 313 U.S. 289, at page 294, 61 S.Ct. 995, 85 L.Ed. 1361.

Corporation. The stock to be transferred to the Commission was to be placed in escrow pending the completion of the subsidy and loan arrangements, and it was agreed that if those arrangements had not been completed within sixty days the parties could demand the return of the stock and the whole agreement would cease and terminate.

The agreement contained a meticulous negative recitation of undertakings which the Commission had not made. Among these negative recitations were that the Commission did not agree to enter into the subsidy arrangement until the required findings had been made by it and terms respecting the subsidy had been reached by the Commission "and the party or parties to the subsidy agreement"; the same limitation as to the loan; that the Commission had no duty to make loans or advances to Dollar of Delaware except as provided in the subsidy and loan agreements; and that the Commission had no obligation to continue to hold any of the stock of Dollar of Delaware which it might acquire under the agreement.

By October, 1943, the entire indebtedness of Dollar of Delaware to the Commission had been paid.

In July, 1945, Dollar of California received information that the debts of Dollar of Delaware had been paid. Thereupon it and the other plaintiffs in this action made demand for the return of the stock. The Commission refused on the ground that the Adjustment Plan was an outright acquisition rather than a pledge transaction.

In support of its contention that the Adjustment Plan was an outright acquisition of full ownership, the Commission points to the following factors:

1. *The words used in the agreement.* The Adjustment Plan provided that "Dollar of California will transfer, or cause to be transferred, all of said stock to the Commission, or its nominee, free and clear of all liens and incumbrances". Pursuant to the Adjustment Plan R. Stanley Dollar and the estate of J. Harold Dollar executed "assignment and option agreements" in respect to the Class A stock then under pledge to

the Anglo Bank. Those agreements used the words "hereby sells, assigns, transfers, and sets over" to the Commission "all his right, title, and interest in and to" the stock. The language thus used in the Adjustment Plan and in the subordinate agreements was, says the Commission, "the classic language used by lawyers for centuries to transfer absolute, unqualified title."

2. *Petition to probate court of the executors of the estate of J. Harold Dollar.* The estate of J. Harold Dollar contained a block of the Class A stock, some of it pledged to the Anglo Bank and some not so pledged. The executors of the estate filed in the probate court a petition, captioned "Petition of Executors for Order Authorizing Sale of Stocks * * *", etc., in which the prayer was for authority "to transfer all right, title and interest of the above estate" in the stock. The judge entered an order in the same language.

3. *Failure to describe the transaction as a pledge.* No words of pledge were used in the Adjustment Plan in reference to the transfer of the stock to the Commission, although, in describing prior transactions involving the stock (such, for example, as the pledge to the Anglo Bank), the word "pledge" was used freely.

4. *No words stamped on the certificates to indicate limited ownership.* The certificates contained no legend purporting to limit the transfer to a pledge. The old certificates were endorsed in blank, and the new certificates, issued to the Commission, were absolute on their faces. The shares which were under pledge to the Anglo Bank were stamped with a legend to that effect.

5. *Lack of market value of the stock.* The stock, at the time of the Adjustment Plan, had little or no market value. The Commission says that this lack of value in the stock shows that the transfer was a sale, because the transferors gave up assets of little or no value and in return were released from liability and moreover acquired a chance to realize something on their preferred stock.

6. *Notice of intention of the Commission to treat the agreement as a sale.* The Commission issued a press release on August

19, 1938, stating that the agreement provided for transfer to the Commission of absolute title, which notice was published in the San Francisco newspapers and a copy sent to R. Stanley Dollar. At the time of this release the period for consummation of the agreement had not expired and, in fact, R. Stanley Dollar thereafter signed an extension agreement.

7. *Admissions of appellants that the transfer was a sale.* (a) In his income tax return for 1938 R. Stanley Dollar took a capital loss on the entire cost of the stock, reciting the Adjustment Agreement. (b) R. Stanley Dollar, in a letter to his New York stock dealer, referred to himself as a former owner of the stock. (c) The stock was dropped from the balance sheet of Dollar of California after the Adjustment Agreement. (d) The petition filed by the executors of the J. Harold Dollar estate, above described. These executors were signatories of the Adjustment Agreement and knew its meaning.

8. *Negotiations leading up to the agreement.* The Commission admits and the record shows that the negotiations began as attempts to avoid bankruptcy of Dollar of Delaware by setting up additional security against its debts and by securing for it additional loans. The parties were at variance on the subject of guarantees by Dollar of California. The Commission says that these negotiations fell through and were terminated, and points to a telegram to it from its representative in California, reciting that Dollar had rejected the Commission's offer and stating that the only alternative to bankruptcy would be an absolute transfer of title to the stock.

In support of their contention that the transaction of August, 1938, was a pledge and not an absolute transfer, appellants point to the following:

1. *Prior negotiations.* It is agreed that the negotiations began as an attempt by the Commission to obtain additional security against the debts due. Appellants say there was no break in the continuity of the negotiations. They say that the sequence of the critical events was as follows: For a year and a half conversations were carried on between the Dollar interests and the Commission concerning greater security for the debts due the Commission. In 1938, after an exchange of letters between the Dollar interests, the Commission and the Reconstruction Finance Corporation, Dollar sent a telegram on June 16th making an offer of transfer of stock; in response came a telegram from the Commission, which ignored the proposal of Dollar and insisted that Dollar either accept or reject a standing proposal of a prior date; next in order, on June 19th, came a telegram to the Commission from its representative, which appears to establish a break in the negotiations; in reply to that telegram the Commission wired on June 21st that it would consider the proposal of Dollar of California contained in the June 16th telegram; on July 12th a draft of a plan was submitted by the Commission's representative to the Dollar interests. Appellants say that the reply of the Commission to the June 19th telegram from its representative refers back to June 16th and so negatives a break in the negotiations. In addition, Dollar says that the entire negotiations concerned voting control of the company to protect the security of the Commission for the debts due.

2. *The words of the agreement indicate a pledge.* The word "transfer" used throughout the agreement is equivocal. The words "free and clear" were used to distinguish the stock subject to the prior pledge. Appellants say that there is nothing inconsistent with a pledge in any of these words, that, in fact, they are necessary to establish a pledge.

3. *Provision in the agreement authorizing sale clearly indicates a pledge.* Section 23(d) of the Adjustment Plan provides that the Commission may sell the stock, and there would be no purpose in inserting such a provision if the transfer were an absolute sale. Appellants say that the only possible reason for inserting such a provision was to give authority to sell security.

4. *Continuing debt.* The Plan specifically provided that the transfer of the stock did not reduce the indebtedness of Dollar of Delaware. The continued existence of the

entire debt is a prime indication that the transaction was a pledge.

5. *Lack of consideration for a sale.* The minor parties, Admiral Oriental Lines, Lorber, Fleishhacker, and the estate of J. Harold Dollar received no consideration for the transfer of their stock, since none of them was liable on any of the notes or mortgages.

6. *The purpose of the agreement was to obtain control.* The dominant purpose of the agreement, as shown in Sections 3, 4 and 5, was to control the corporation in order to protect the security of the Commission for the debts due it.

7. *Contrast in the language of the agreement.* Sections 1 and 2 of the agreement provide that the stock shall be "transferred". Section 9 provides that the office furniture will be "sold" to the Commission. Appellants say that this shows that the parties intended to distinguish between the office furniture and the stock—the former was sold and the latter was not.

8. *The new certificates were to the Commission.* When the Commission, being in control of the corporation, issued the new certificates pursuant to the Plan, it issued them to itself, not to the United States, although, according to its own argument, if the transfer was outright it was to the United States and not to the Commission. Only a pledge could be to the Commission as such.

9. *The equitable nature of the transaction was distinctly a pledge.* This transaction would be held a pledge if two private litigants were involved. There was an existing debtor-creditor and mortgagor-mortgagee relationship before the agreement; the agreement arose out of negotiations which began for the purpose of making additional security arrangements; the debtor was completely under the control of the creditor; the creditor wound up with some 92 per cent of the stock of the debtor *and* was repaid the entire indebtedness due it. Equity would construe such a transaction between private parties as a pledge.

We are of opinion, upon balancing the conflicting considerations, that the transfer of the shares under the 1938 contract was a pledge. We are led to this conclusion principally by the weight of two considerations: (1) the general equitable character of the transaction and (2) the action of the Commission, at the time, in issuing the new certificates to itself and not to the United States.

It seems plain beyond question that if this transfer had occurred between two private individuals no court of equity would have treated the transfer of the shares as other than a pledge. The details of the transactions are exceedingly complicated, but they are summarized simply. Dollar was a debtor in a sum of some $7,000,000. At a time when its financial outlook was exceedingly bad its owners "transferred" to its creditor 92 per cent of its stock. Thereafter Dollar paid off its debt in full.

Because of the power which a creditor has over his debtor, especially a distressed debtor, equity views with considerable skepticism claims by the creditor of rights beyond the right to security and repayment. Pomeroy states the matter thus:

"This doctrine is based upon the relative situation of the debtor and the creditor; it recognizes the fact that the creditor necessarily has a power over his debtor which may be exercised inequitably; that the debtor is liable to yield to the exertion of such power; and it protects the debtor absolutely from the consequences of his inferiority, and of his own acts done through infirmity of will. The doctrine is universal in its application, and underlies many special rules of equity." [7]

Equity tends strongly to treat as mortgages or pledges transactions between debtors and creditors relating to property of the debtors; even conveyances absolute on their face may be treated as mortages if in fact they were security for and not satisfaction of the debts.[8] Pomeroy, citing many cases, describes the "general criterion * * *

---

7. 4 Pomeroy, Equity Jurisprudence § 1193 (5th ed. 1941).

8. See 4 Pomeroy, id. at § 1196. To the same effect see 1 Glenn, Mortgages § 11 (1943); 2 Story, Equity Jurisprudence §§ 1018–1020 (13th ed. 1886); 1 Jones, Mortgages §§ 316, 317 (8th ed. 1928).

established by an overwhelming consensus of authorities", "the practical test", "the sure test and the essential requisite". This criterion is the continued existence of the debt. Pomeroy says: "If there is an indebtedness or liability between the parties, either a debt existing prior to the conveyance, or a debt arising from a loan made at the time of the conveyance, or from any other cause, and this debt is still left subsisting, not being discharged or satisfied by the conveyance, but the grantor is regarded as still owing and bound to pay it at some future time, so that the payment stipulated for in the agreement to reconvey is in reality the payment of this existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instruments." [9]

■ In the case before us the debt remained in full force after these transactions and was paid in full. To hold that the creditor not only received payment in full but also became the owner of the debtor in full and absolute ownership would require a clear, almost inescapable, dictate to that effect. There is no such language or circumstance in this record. We give great weight to the application of this firmly established rule of equity.

■ We also think it of prime significance that the Plan provided for a transfer to the Commission, not to the United States; that the Commission caused the new certificates to be issued to the "United States Maritime Commission", not to the United States; and that the Commission continued to hold the certificates in its own possession without transfer to any recognized repository of property of the United States. If the transfer had been outright and absolute the stock belonged to the United States. This is clearly true and is indeed the major premise of the Commission's original contention that this proceeding is a suit against the United States. On the other hand the Commission was authorized by statute to manage and control the security for debts due the United States in shipping matters. The Commission, acting, at the time and since, in accord with its own unimpeded judgment, treated the stock as in its own name, control and possession, a treatment consistent with the idea of pledge but wholly inconsistent with the idea that the United States was the outright and absolute owner. The Commission was an authorized custodian of collateral security, but it was not an authorized titleholder for property permanently owned outright by the United States.

■ Other points stressed by the parties respectively are inconclusive one way or the other. Each party makes impressive translations of texts or events, but the actual documents and occurrences do not convey unqualified meanings. Thus the word "transfer" does not necessarily mean conveyance of absolute ownership. In an ordinary loan at a bank upon collateral the borrower endorses stock certificates in blank and the usual printed form which he signs contains the word "transfer" and also the words "sell, assign," etc. That the transfer in the present case was to be "free and clear", a fact stressed by the Commission, is not indicative of absolute transfer; the expression "transfer free and clear of encumbrances" means that there are no prior encumbrances on the property; it does not mean that no encumbrance is now being placed on it. The expression is a common one in pledges and in mortgages. Similarly there is no decisive indication that the negotiations were continuous, although interrupted, or that they were broken and begun anew. It is agreed by both parties that in the early stages the discussions concerned security only. There is no doubt upon that point. The question is whether there was an abrupt change of subject. The Commission relies heavily upon communications between it and its representative, but so vital a change in the course of such negotiations would have to be brought home to the corporation also. The expressions by which that is sought to be done are ambiguous to say the least.

9. 4 Pomeroy, op. cit. supra note 7, § 1195.

■ The use of the word "sale" in the petition of the executor of the estate of J. Harold Dollar to the probate court loses impressiveness upon examination. The word appears only in the caption of the petition; it appears nowhere in the body or prayer or in the waivers signed by the heirs. Moreover the probate law of California seems to require a cash payment of at least 25 per cent of the sales price upon the sale of property in an estate.[10] If the probate judge had meant to authorize a sale in the true sense of that term, he would certainly have made some reference to such a code provision on the subject. And, again, even if this caption characterization were an admission, it was by only one of appellants; no knowledge of it is attributed to the others.

■ Similarly, the lack of present market value in the common stock is not a decisive index of the nature of the Plan. There is a dispute as to the value of the stock, depending upon whether it is viewed from the standpoint of then-present cash market value, long-range potential earnings, or as the means of control of the company. The fact that a forced sale of the ships would not pay off the debt does not establish that the Commission took outright ownership of the stock. Voting control, which went with pledge as well as with ownership, was admittedly one of the objectives of the Commission, and this might well have been a conclusive objective. There were thirteen ocean-going ships in this fleet. Voting control meant potential recovery of the debts due the United States and also potential resuscitation of a major maritime operation for the nation. That the common stock then had no other value would not negative the thesis that the transfer was a pledge.

■ The absence of a legend of pledge stamped upon the certificates is of no moment. A bank does not permit a debtor to place a legend of pledge on stock given as collateral, because such a legend would prevent disposition of the collateral without some formal action, possibly by a court, or by a harried directorate if the debtor be a corporation. The presence of the legend on the stock already pledged to the Anglo Bank is of no significance in this connection. That legend was not stamped on those certificates at the time of the pledge to the Anglo Bank, but was placed there pursuant to the Adjustment Plan, for the purpose of identifying the stock already under pledge. Indeed, the fact that there was no legend placed on the certificates when the stock was pledged to the Anglo Bank is sufficient demonstration for purposes of this case that the absence of legend is consistent with a pledge.

■ The admissions reflected by the deduction on R. Stanley Dollar's income tax return and the letter he wrote to the New York stock dealer are indices of absolute transfer, and we weigh them in the balance as such. It is true, as appellants claim, that Mr. Dollar might have taken the same loss as upon a worthless stock (if the stock was indeed worthless), but he did not cast his deduction in that form. On the other hand the fact that the stockholders other than Dollar of California and R. Stanley Dollar were not sureties on the notes tends to indicate that the stock was not transferred outright in consideration of the release of the sureties. Under the theory of surety release by outright transfer these other stockholders received nothing for complete abdication of ownership.

■ We do not give weight to appellants' contention that Section 23(d) of the Plan provides affirmatively that the Commission may sell the stock. The provision does not read so but is negative in form, saying that the Commission was not obligated to hold the stock. Such a provision might well be inserted by a new owner to negative any implication that it must retain its ownership for a time.

■ The Commission contends that it had power to acquire this stock because it had power to subsidize the company. Its argument in this respect is elusive and indirect. It says that it had power to subsidize, and therefore it must determine the financial qualifications of the company; it might

10. See Section 773 of the Probate Code.

require financial stability, and therefore it might require reorganization; thus it might direct a modification of the creditor rights of the United States, and therefore it had power to take ownership of the stock in exchange for the release of the sureties as part of a reorganization to qualify the Dollar company for subsidy. That is the course of the argument in the brief before us. But, however extensive the statement of the argument is, the unglossed contention is that the grant of a subsidy could be (and was in this case) part of the consideration for the outright acquisition of all the common stock of a company. A more direct contradiction of the terms and intent of the statutes, both those relating to this Commission and those relating to the Reconstruction Finance Corporation, could scarcely be formulated.[11] The subsidy and loan powers there provided were for the rehabilitation of private industry. They were not blinds for Government acquisition of operating industrial concerns. Subsidy is not a synonym for socialization. While it is perfectly true that the Commission could, and should, make all proper and desirable requirements for the protection of Government loans, its power stops at the line which separates the lender from the acquisitor. It could validly come into ownership of stock in the course of foreclosing collateral in the collection of a debt, but it could not acquire outright ownership in the guise of lending money and creating a debt. If the Commission did in fact grant the subsidy and arrange the Reconstruction Finance Corporation loan as consideration for the acquisition of outright and absolute title to full ownership of this stock, we think it exceeded any power granted it by the Congress. We do not think that it actually did so or intended to do so.

This brings us to consider again the precise principal contention of the Commission, which is, as we have outlined at the beginning of this opinion, that the stock was taken in compromise or settlement of its claim against the sureties (Dollar of California and R. Stanley Dollar) on the notes. It is not enough to say, in support of that contention, that the claims against the sureties were settled or cancelled. The question is whether the Commission acquired absolute ownership of the stock as a settlement of such claims. Here again we must look at the essential nature of the transaction and not play upon phrases. A is personally liable as surety on the note of B. He transfers to the creditor certain stock, and the creditor releases him from his personal suretyship. The debt remains in full effect in its full amount. The debtor remains liable. The debt is paid in full. Did the creditor acquire ownership of the stock as a consideration for the release of A, or was the transaction a substitution of negotiable collateral for a personal suretyship? In ordinary commercial transactions full consideration for release from a suretyship is paid by the surety in either of two ways, (1) satisfaction of part of the debt or (2) other collateral acceptable to the creditor is supplied. Divorcing the problem before us from the complicating factors presented by the record, we perceive no difficulty in it. Where the debt continues intact and the creditor releases a surety upon deposit of a paper security, the creditor does not by that transaction alone become absolute owner of the security thus deposited. He holds it as pledgee. Any other conclusion, if the transaction were between private parties, would be wholly untenable in our opinion. We do not see why the transaction should have a different essential nature merely because a Government agency was a party.

For emphasis we repeat that this problem cannot be determined by a syllogistic process, beginning with the naked proposition that the Commission can acquire stock in a compromise of a claim, proceeding then to a minor premise that the liabilities of the sureties were cancelled in this transaction, and then drawing from those premises the conclusion that therefore the Commission

---

11. See Sec. 5 of the Reconstruction Finance Corporation Act, 47 Stat. 5, 6 (1932), 15 U.S.C.A. §§ 601–617; 46 U.S. C.A. §§ 1171–1182.

acquired absolute ownership of this stock. Such reasoning is fallacious logically and leads us far from the actual and essential nature of the transaction.

■ The next contention of the Commission is that this action is a suit against the United States. Since we hold that the transaction was a pledge, we also hold, following the opinion of the Supreme Court in the prior appeal, that the United States is not a necessary party.[12]

■ The Commission next says that the suit was barred by the statute of limitations. Its argument is that if there were no power to acquire the stock outright the cause of action accrued immediately upon the transfer in 1938; that if the transaction were a pledge the cause of action accrued at the time the debt for which the security was pledged was satisfied; that the stock was pledged to secure the ship purchase indebtedness and that debt was satisfied in 1941. The action was brought in 1945. The obvious answer to this contention is that the statute of limitations does not apply. This is a suit in equity governed by the doctrine of *laches*. Mere passage of time does not constitute *laches*. When an unreasonable time passes and the delay is caused by unexcused lack of diligence, such delay constitutes *laches*.[13] There was no such inexcusable lack of diligence in this case. Appellants looked upon this transaction as a pledge securing the entire indebtedness, and under that view they had no right to the stock until the debt was completely paid in 1943. A period of two years between that date and 1945 was not unreasonable. We are shown no facts which support the application of *laches* to this case.

The judgment of the District Court is reversed and the case remanded for entry of judgment in accordance with this opinion.

Reversed.

12. The Supreme Court not only set the law of the case on this point in the prior appeal but iterated it in Larson v. Domestic & Foreign Commerce Corp., 1949, 337 U.S. 682, at page 702, note 26, 69 S.Ct. 1457, 93 L.Ed. 1628.

13. Holmberg v. Armbrecht, 1946, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743, 162 A.L.R. 719.